

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 14, 2023

**BY ECF**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

Re:  **United States v. Jonathan Ghertler**, 23 Cr. 100 (ER)

Dear Judge Ramos:

The Government submits this letter in advance of the sentencing in this matter for defendant Jonathan Ghertler (the "defendant"), which is scheduled for August 16, 2023.  On June 30, 2023, the defendant pled guilty pursuant to a plea agreement to one count of wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2, and one count of making false statements, in violation of Title 18, United States Code, Sections 1001(a)(1), 1001(a)(2), and 2.  In the plea agreement, the parties stipulated to a Guidelines range of 92 to 115 months' imprisonment. Because of the brazen and sizeable nature of the defendant's fraud, his extensive history of engaging in similar criminal conduct, and his almost certain likelihood of recidivism, the Government recommends a sentence of 115 months' imprisonment.

**A.  Overview**

i.  The Offense Conduct

In May 2021, the defendant began a brazen scheme to defraud some of the most sophisticated businessmen in the country.  He succeeded.  And towards the end his fraud, the defendant did everything he could to avoid getting caught, including impersonating a partner at a global law firm in phone calls with FBI agents and the United States Attorney's Office— demanding that they end their investigation.  They did not.

a.  The Fraud on the Portfolio Company of the Investment Firm

In May 2021—while living in a halfway house and serving a sentence for violating the terms of his supervised release—the defendant began impersonating the billionaire founder of an Investment Firm (the "Billionaire Founder").  The defendant, posing as the Billionaire Founder, contacted the CEO of one of the Investment Firm's portfolio companies ("IF Portfolio Company"), claiming that he needed IF Portfolio Company to pay a private investigator who was examining

issues related to the Billionaire Founder's alleged relationship with Jeffrey Epstein. In reality, there was no investigation. But the CEO thought he was speaking to the Billionaire Founder, so he agreed. Over the next two years, the defendant spoke to the CEO more than a dozen times, continuing to demand money to fund the non-existent investigation. In total, IF Portfolio company wired $910,000 to bank accounts controlled by the defendant.

The defendant was extremely sophisticated in his fraud. He extensively researched the Billionaire Founder, his personal life, and his businesses. Over the course of years, he developed relationships with multiple executives at IF Portfolio Company, including its CFO. He became particularly close to the CEO of IF Portfolio Company, all the while impersonating the Billionaire Founder. At one point, the defendant told the CEO that he should pay himself a substantial bonus. Towards the end of the fraud, the defendant discussed with the CEO the possibility of IF Portfolio Company purchasing or merging with a restaurant chain owned by another investment firm. Had he not been arrested, it seems likely that the defendant was preparing to greatly expand his fraud, premised on this fake investment or merger.

b.   The Fraud Scheme Targeting Portfolio Companies of the Private Equity Firm

Beginning in December 2021, the defendant began a multipronged and highly successful fraud of portfolio companies of a global private equity firm's (the "Private Equity Firm-1"). In each case, he impersonated the Private Equity Firm-1's general counsel (the "General Counsel"), asking that the portfolio company fund an internal investigation into links between senior employees of Private Equity Firm-1 and Jeffrey Epstein. In reality, there was no such investigation. But having expertly researched the Private Equity Firm-1 and its portfolio companies, the defendant was able to credibly impersonate the General Counsel. One portfolio company executive said that the defendant seemed to have inside information about the portfolio company, given the extent to which he was knowledgeable about its business. And an attorney at one of the portfolio companies, who had previously met the real General Counsel, spoke to the defendant over the phone while he was committing the fraud. She said she was convinced, at the time, that the defendant was the actual General Counsel. The defendant appears to have even mimicked the sound of the General Counsel's voice.

Executives of one of the portfolio companies taped a call with the defendant, as he was posing as the General Counsel. (Exhibit A[1]). The defendant's modus operandi can be seen— among other things, he plays to the executives' egos: "there's three main portfolio companies that we're keeping in the loop, and you're one of those." He then explains why he needs the portfolio company to pay for the investigation: if the investigator were paid by the Private Equity Firm-1 directly, "gossip would start."

In total, the defendant attempted to defraud at least four of the Private Equity Firm-1's portfolio companies. He was able to trick two of them into paying a combined $200,000 to fund the non-existent investigation.

---

[1] To preserve the privacy and the confidentiality of the victims, the Government respectfully requests that Exhibit A be filed under seal.

These were not one off, quick strikes.  The frauds were meticulously planned and committed to, and they occurred over the course of months.  Each fraud involved extensive conversations over phone and text with the executives of the portfolio companies to gain their trust and convince them that they were indeed speaking to the General Counsel.  In committing the frauds, the defendant created a fake investigation firm, "EM Molina Investigations, LLC," developed fake invoices for EM Molina Investigations, used the Private Equity Firm-1's letterhead, forged the General Counsel's signature, created fake business email accounts for EM Molina Investigations, spoofed a New York-based phone number so that he would appear to be based in New York (like the General Counsel), and utilized a highly sophisticated means of spoofing his internet protocol ("IP") address so that his location and identity could not be traced.  In an attempt to further mask his identity, the defendant took advantage of someone he later told FBI agents he considered to be his "adopted" daughter (the "Individual-1")—he used the bank account and social security number of the 25-year-old woman in fake W-9 forms he created for EM Molina Investigations, LLC.

### c.   The Defendant Attempted to Defraud a Second Private Equity Firm

After the defendant was charged by Indictment and news of the defendant's arrest spread, the Government learned of an additional victim, a second global private equity firm ("Private Equity Firm-2").  In December 2021, the defendant reached out to a portfolio company of Private Equity Firm-2, pretending to be the general counsel of Private Equity Firm-2.  As with the other victims, the defendant asked that the portfolio company fund a non-existent investigation regarding Jeffrey Epstein, and requested that payment be made to "EMolina LLC."  Fortunately, the portfolio company reached out to the real general counsel of Private Equity Firm-2 and the attempted fraud was thwarted.

In addition, the defendant's Internet browser history, which was obtained pursuant to a search warrant, shows that the defendant was researching other private equity and investment firms, presumably as additional targets to defraud.

### d.   The Defendant Obstructs Justice

In early-February 2023, an FBI special agent reached out to IF Portfolio Company after identifying a payment made by IF Portfolio Company to one of the defendant's bank accounts.  Executives at IF Portfolio Company reported the FBI's outreach to the defendant, whom they still believed was the Billionaire Founder.  The defendant asked for the special agent's contact information and told the executives he would connect his lawyers with the agent to clear up any misunderstandings.  On February 7, 2023, the defendant, posing as a chairman (the "Chairman") of a global law firm, spoke on the phone with two FBI special agents and the undersigned Assistant United States Attorney.  He purported to be representing the Billionaire Founder and IF Portfolio Company.  The defendant told them that IF Portfolio Company had been defrauded in a scheme related to an investigation into the Billionaire Founder's ties to Jeffrey Epstein but chose not to report the crime to law enforcement because IF Portfolio Company was "made whole" by the fraudster.

Several days later, the defendant, again posing as the Chairman, had another call with FBI special agents.  That call was recorded.  On the call, the Chairman told special agents not to

continue their investigation because "if the money was paid back prior to, uh, the crime being, uh, discovered, uh, it's not a crime." (Exhibit B).[2] He added that the Billionaire Founder of the Investment Firm "has a lot of other issues he is dealing with right now, so this is one he really doesn't need to deal with." (*Id.*).

ii. Procedural History

The defendant was charged in an Indictment with one count of wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2, one count of aggravated identity theft, in violation of Title 18 United States Code, Section 1028A(a)(1), 1028A(b), and 2, and one count of making false statements, in violation of Title 18, United States Code, Sections 1001(a)(1), 1001(a)(2), and 2. The defendant has been detained since February 17, 2023, when he was arrested in Florida, where here lived and committed the fraud.

On June 30, 2023, the defendant pled guilty to Count One (wire fraud) and Count Three (making false statements) of the Indictment pursuant to a plea agreement (the "Plea Agreement"). The parties stipulated to an offense level of 26 and a Criminal History Category of IV, resulting in a Stipulated Guidelines Range of 92 to 115 months' imprisonment. The Probation Office agrees with this Guidelines calculation. (Presentence Investigation Report ("PSR") ¶ 125).

**B. Discussion**

i. Applicable Law

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (quoting *Gall*, 552 U.S. at 46).

---

[2] To preserve the privacy and the confidentiality of the victims, the Government respectfully requests that Exhibit B be filed under seal.

ii.  <u>The Defendant's Conduct and History Warrant a Sentence of 115 Months'
Imprisonment</u>

The Court should impose a sentence of 115 months' imprisonment. Such a sentence is necessary given the seriousness of the offense, the characteristics of the defendant, and the need to promote respect for the law and afford adequate deterrence to criminal conduct.

a.  *The Seriousness of the Offense*

The defendant's conduct was extremely serious—over the course of almost two years, he committed multiple, highly sophisticated frauds on prominent and sophisticated businesses, stealing over $1 million.  These were not one-off frauds.  He had extensive conversations with the executives at the victim-companies, over the course of many months, first to build their trust—to convince them he was someone he was not—and then to carry out his fraud.  He manipulated them, even convincing one executive that he should be paid a bonus.  And the defendant left no stone unturned.  He methodically planned and executed his scheme.  He researched the victims extensively.  He displayed such a granular understanding of their businesses that he appeared to have inside information.  He created a fake investigative company and used highly high-tech means to further his fraud—including utilizing fake email addresses, spoofing a New York-based phone number, forging the letterhead of Private Equity Firm-1, and masking his IP address.

In total, the defendant defrauded three companies and attempted to defraud three more—all portfolio companies of global private equity or investment firms.  The defendant now attempts to minimize his conduct—claiming to be a "Robinhood" who "prey[s] on corruption" by stealing from the rich to give to the poor.  (PSR ¶ 101).  Not so.  The defendant did not give away fraud proceeds to the poor.  Far from it.  He spent the money on himself: luxury vacations, cars, and drugs.  The defendant's attempt to downplay his frauds because the victims were corporations and financial firms is belied by the real impact that corporate frauds have: by minimizing societal trust, increasing ultimate costs for consumers, blindsiding the people who work at the defrauded companies, and decreasing the financial wellbeing of the investors that ultimately own these companies—pension and mutual funds that invest the money of hardworking, ordinary Americans.

Moreover, it is important to emphasize that there were real people who were victimized here.  In furtherance of his scheme, the defendant stole identities—over the course of many months, he repeatedly used the identities and adopted the personas of the Billionaire Founder, the General Counsel, and the Chairman.  He even successfully mimicked the voice of the General Counsel.

The defendant was even willing to use the identity of Individual-1, whom he called his "adopted daughter."  In a post-arrest confession, which was recorded, an FBI special agent questioned the defendant, asking if Individual-1 had been in on the scheme given her bank account had been used to receive fraudulent funds and her social security number was listed on a fake W-9.  The defendant said she was innocent, explaining, "I used her; I always use everybody."  But that meant nothing to the defendant—stealing identities and adopting the personas of others was core to the success of his fraud.

There was no bridge that the defendant was not willing to cross to further his fraud.  Close to end of the fraud, the defendant abused a position of trust by assuming the identity of a prominent

lawyer—the Chairman—and taking advantage of the attorney-client relationship to obstruct a federal investigation into his crimes.  The defendant told the CEO of IF Portfolio Company that there was no need for IF Portfolio Company to communicate with the FBI—the Chairman would handle it.  The defendant then impersonated the Chairman to brazenly and repeatedly lie to FBI agents in an attempt to thwart the investigation.

        b.   *The Defendant's History and Characteristics and the Need for Deterrence*

The history and characteristics of the defendant and the need to promote respect for the law also strongly support the imposition of a sentence of 115 months' imprisonment.  *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A).  The defendant is a career fraudster.  By his own admission, he "gets a rush from the success of the con." (PSR ¶ 101).  The only way to protect the community from the defendant is for him to be in prison.

His own history proves this.  The defendant's history of committing fraud is difficult to overstate.  The defendant is 61 years old and has spent the significant majority of his adult life in prison for his various fraud schemes.  But despite having received many substantial prison terms, the defendant has not been deterred.  This is his 16th conviction—and his *fourth* federal conviction for wire fraud.  He also has convictions for larceny, forgery, burglary, theft, trespassing, and transportation of stolen money.  As the PSR describes, the defendant follows a pattern.  Invariably, within months of being released from prison—or sometimes while still in prison—he is at it again, engaging in a new fraud or other illegal activity.  And a year or two later—often sooner—he is again arrested and sentenced to prison.  And then the cycle begins anew.

The devastating impact on the victims of his frauds mean nothing to the defendant.  He appears to have a sociopathic desire to defraud and use others.  He has defrauded his brother (PSR ¶ 101), stole checks from and used the identity of his mother (PSR ¶ 70), and used the identity of Individual-1, his "adopted daughter."

Indeed, in his long history of committing large-scale frauds, the defendant has repeatedly adopted the identity of others and engaged in schemes remarkably similar to the instant offense. For example:

- In 1994, he impersonated someone he had met and used this person's identity to defraud MGM Grand Hotel and Casino out of $100,000.  (PSR ¶ 67).  He was sentenced in Nevada state court to 10 years' imprisonment.  (*Id.*).

- In 1995, he impersonated the Vice President of Lockheed Missile and Space Company and convinced Lockheed employees to send him $60,000 to fund an audit.  (*Id.* ¶ 68).  He was sentenced in the Northern District of Alabama to 30 months' imprisonment.  (*Id.*).

- In 2000, the defendant impersonated partners at law firms and convinced employees at those law firms to wire, in total, $105,000 to fund what he claimed to be were retainers.  (*Id.* ¶ 71).  He was sentenced in the Southern District of New York to 71 months' imprisonment (the "SDNY Conviction").  (*Id.*).

- In 2007, he impersonated the general counsels of corporations and persuaded their employees to wire money to him, purportedly to fund an urgent transaction. (*Id.* ¶ 72). He was sentenced in the Middle District of Florida to 162 months' imprisonment (the "MDFL Conviction"). (*Id.*).

The MDFL Conviction is notable for three reasons.  First, the sentence of 162 months' imprisonment was significantly longer than the 115-month sentence of imprisonment that the Government is requesting here, despite the MDFL crime involving a lower actual loss amount and almost identical conduct.  (*Id.*).  If anything, the conduct in the MDFL Conviction was less egregious than what the defendant did here—lie to FBI agents and an Assistant United States Attorney and ask them to end their investigation.  Any hope that age will temper the defendant is belied by the fact that his crimes appear to have only gotten larger and more egregious as he has gotten older.

Second, the procedural history of the MDFL conviction demonstrates how the defendant cannot be deterred by anything short of imprisonment.  Indeed, the defendant committed the MDFL crime while living in a halfway house and still serving his sentence for the SDNY Conviction.  (*Id.*).  And then, at the end of his term of imprisonment for the MDFL Conviction—while still in prison—he started received hundreds of thousands of dollars of suspicious transactions into his bank account.  (*Id.*).  The defendant was ultimately charged with violating the terms of his supervised release and, in August 2020, was sentenced to 20 months' imprisonment with no supervision to follow.  (*Id.*).  In May 2021, while living in a halfway house and only a few months away from ending his sentence (*id.*), he began his fraud of IF Portfolio Company.

Third, when the defendant was first sentenced for the MDFL Conviction, he promised the Court he would do better.  As here, he said, "Something's [sic] in me changed."  (Exhibit C at 21).[3]  In sentencing the defendant to an above-Guidelines sentence, the Honorable John Antoon II, United States District Judge for the Middle District of Florida, said the following:

> Mr. Ghertler, I have to say this is one of the most interesting cases I've seen in a long career on the bench, interesting because you yourself are an interesting man. I'm convinced that you could have been a lawyer, an actor, a stockbroker, you could have pursued any number of lawful courses of employment. You're an intelligent man. You're a gifted man in many respects. And I hope that when this is over or even before it's over that you'll put some of your intelligence and some of your talent to good use.
>
> It may be that you're right, that you can't help it, that you're just compelled to do it. It may be some addiction to adrenalin that you, an adrenalin rush you get when you're doing something that's outside the law. But I'm hopeful that you'll get some other sense of

---

[3] The defendant was initially sentenced to 185 months' imprisonment but that sentence was vacated; on remand, he was sentenced to 162 months' imprisonment.  (*Id.*).  The attached transcript is from the first sentencing.

> satisfaction by putting your skills and your intellect to work within the law. It's going to be difficult, but you know people or know of people who have turned around and made a contribution having had a background similar to yours. I have to tell you, it is, it's mind boggling to hear of how you perpetrated crimes. You have to have tremendous insight, sales. You could be a wealthy man, you know, having a career in sales. You know all this. You know all this. But the –
>
> . . .
>
> But the thing is if you get out and you're still committed to this course of action, you know, it only gets worse. You're already a category six. It doesn't go any higher, but if you commit crimes in the future, you will be treated more severely because of your criminal record.

(*Id.* at 29-30).  The defendant did not heed Judge Antoon's warning.  Even before the defendant was finished serving his sentence, he was back at it.  And when the defendant completes the term of imprisonment imposed by the Court here—perhaps even before—he, unfortunately, likely will be at it again.  He is unlikely to stop, and he has demonstrated that he cannot be deterred.  And for that reason, the Court should impose a 115-month sentence of imprisonment.

        c.   *The Court Should Discount the Defendant's Leukemia Claims*

The defendant is a con artist.  His long criminal history has shown that his words must be closely scrutinized and no document he provides can be taken at face value.  The defendant claims to have been diagnosed with leukemia.  But the Government agrees with the PSR that his medical records do not reflect such a diagnosis.  (PSR ¶¶ 95-97; Dkt. Defendant's Sentencing Submission at Exhibit B).  Indeed, those records suggest a diagnosis would be difficult because, "unfortunately [the defendant] has multiple factors which are also playing into some his current symptoms including ███████████████████████████████████████████████████████████████████." (*Id.*).

The Government spoke with a physician at Essex County Correctional Facility ("Essex"), who reviewed the defendant's medical records.  The physician reported that the defendant



The physician finally reported that the defendant would be seeing an oncologist out of Essex in the next month or so.

In light of the upcoming appointment and the lack of clarity on whether the defendant has leukemia, the Government asked defense counsel to consent to an adjournment of sentencing until after the appointment, so that any diagnosis could be shared with the Court.  Defense counsel indicated that the defendant would not be willing to do so.

The Government is concerned that the defendant may be lying about or overstating his condition.  The defendant has done so before.  At the plea hearing for the SDNY Conviction, defense counsel, like here, asked for an expedited PSR.  (Exhibit D at 10).  The reason provided was eerily similar to what was proffered here: Defense counsel at the time said, "Judge, there are two reasons why an expedited sentencing would be appropriate here.  One is because of his medical condition, which is worsening, and if he were sentenced sooner, he would probably, even if incarcerated, be amenable to better medical facilities than he is currently getting at MDC in Brooklyn.  They are virtually not treating him."  (*Id.*).  The defendant himself added at the time: "the facility I'm at, MDC, they have known that I've had this illness since I got here.  They have told they would send me to these medical facilities and everything like this, and then everything disappeared. I haven't seen a doctor in three months."  (*Id.* at 11).

Based on these proffers by defense counsel and the defendant, the Honorable Robert L. Carter, then-United States District Judge for the Southern District of New York, ordered an expedited sentencing.  (*Id.*).  But the defendant's medical condition was, at the very least, highly exaggerated.  The SDNY Conviction presentence report stated that the defendant had "provided false information about his medical condition to the Court and to Pretrial Services in an effort to gain leniency from the Court in [this] case."  (PSR ¶¶ 97).  The Government does not know what illness the defendant was claiming to have at that time or whether Judge Carter found that an obstruction enhancement should apply.  But whether the defendant's false statements met the technical definition of obstruction is beside the point—the reality is that there was evidence presented that the defendant, then in his early-40s, misled the court about a serious medical issue.  And the Government is concerned that he is trying to do that once again.

In light of the current record and the defendant's history of misleading the Court about medical issues, the Court should view with substantial skepticism the defendant's claim that he has leukemia.

## C. Conclusion

For the reasons set forth above, a sentence of 115 months' imprisonment is warranted.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by:  /s/ Adam Sowlati
Adam Sowlati
Assistant United States Attorney
(212) 637-2438

Cc: Counsel of record, by ECF

# Exhibit A
# (Filed Under Seal)

# Exhibit B
# (Filed Under Seal)

# Exhibit C

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


UNITED STATES OF AMERICA,

                    Plaintiff,

vs.                              Case No. 6:08-CR-90-ORL-28DAB

JONATHAN D. GHERTLER,

                    Defendant.

------------------------------------------------------------

**January 27, 2009**

**Transcript of Proceedings**
**SENTENCING - DAY 5**


**Before The Honorable JOHN ANTOON II**
**United States District Judge**

APPEARANCES:

For the Plaintiff:     Katherine M. Ho
                       Assistant U.S. Attorney
                       501 W. Church Street, Suite 300
                       Orlando, FL  32805

For the Defendant:     Peter W. Kenny
                       Assistant Federal PD
                       201 S. Orange Avenue, Suite 300
                       Orlando, FL  32801


Proceedings recorded by mechanical stenography, transcript
produced with computer-aided transcription.

```
 1                    P R O C E E D I N G S

 2             (CASE CALLED.)

 3             THE DEPUTY CLERK:  Will counsel please state

 4    their appearances for the record.

 5             MS. HO:  Katherine Ho for the United States, and

 6    seated to my left is Special Agent Abelardo Vecino.

 7             MR. KENNY:  Peter Warren Kenny for the defendant

 8    who is present.

 9             THE COURT:  Now, there were many motions that

10    were filed in this case and I want to make sure before we

11    proceed that they have been ruled upon.

12             There was a motion to suppress evidence, that was

13    document 81.  That motion is denied, if it's not already been

14    denied.  There was a motion to exclude statements from

15    sentencing which was number 65.  That is denied, if it hasn't

16    already been denied.  There was a motion to exclude

17    sentencing conduct not found by a jury or admitted by Mr.

18    Ghertler, that's number 64, and I will dispose of that motion

19    by announcing the rulings to individual objections in the

20    sequence in which they were made.  There was a motion for

21    exculpatory evidence, I believe that that was rendered moot

22    by the government delivering the requested information to the

23    defendant.  Is that correct?

24             MR. KENNY:  Your Honor, they delivered some of

25    it, as you recollect.  They delivered some of the telephone
```

1    calls and did not deliver others. We discussed that, I've

2    forgotten even what day it was of the hearing, but we did

3    discuss it, and the government gave their reasons which I

4    think you found sufficient.

5            THE COURT: Okay. I find that the information

6    was delivered at the request of the defendant, and to the

7    extent that other information is requested in the motion, the

8    motion is denied.

9            I believe that takes care of the outstanding

10   motions with the exception of the motion for exculpatory

11   evidence which really goes to the individual objections that

12   were raised by defendant. Do you agree, Miss Ho?

13           MS. HO: Yes, Your Honor.

14           THE COURT: Do you agree, Mr. Kenny?

15           MR. KENNY: I think the motion for exculpatory

16   evidence was different than the motion to exclude from

17   consideration at sentencing the conduct.

18           THE COURT: It was. But it was things that you

19   wanted to present and you've presented it, right? You've

20   presented what you wanted to present?

21           MR. KENNY: Yes, Your Honor, more or less, within

22   your rulings, yes. But I mean you said that the motion for

23   exculpatory evidence had not been decided. I thought you

24   said you had decided that. I may have misunderstood what you

25   said. But the one that's still open is the one to exclude

```
 1    from consideration at sentence the conduct not admitted or

 2    found by a jury.  Isn't that the one that's still, you're

 3    going to rule on piece by piece?

 4              THE COURT:  Well, to the extent that your motion

 5    is the boilerplate motion to not consider relevant conduct

 6    not found to exist by a jury, that motion is denied to that

 7    extent.  I am going to take up your individual objections in

 8    your summary.

 9              MR. KENNY:  Okay.  That's what I wanted to have

10    clear, that you are in fact denying our motion to exclude

11    from judgment information at sentencing or admitted to in

12    open court.

13              THE COURT:  Yes.  But there's overlap between

14    that motion and the issues that have been raised by way of

15    objection and summarized in your sentencing summary, which is

16    document 86.

17              MR. KENNY:  Yes.

18              THE COURT:  I'm going to address those issues

19    paragraph by paragraph and I need counsel to tell me at the

20    conclusion of this what is left unresolved.

21              The first objection goes to paragraphs six and

22    seven of the presentence report.  Those objections are

23    overruled.

24              The next objections go to paragraphs nine and 12

25    of the presentence report, and those objections are
```

1    overruled.

2              There are objections made to paragraphs 1 and 14,

3    and those objections are overruled.

4              With regard to Lockheed Martin there were

5    objections to paragraphs 15 and 16.  Those objections are

6    overruled.

7              Now, not included in this summary, there was an

8    objection to paragraph 21 that was originally registered by

9    the defendant.  Has the defendant maintained that objection

10   or is it --

11             MR. KENNY:  Yes, he is, Your Honor.  I'm sorry, I

12   was actually following the government's summary and I guess I

13   missed it.  It doesn't really relate to why if itself

14   inasmuch as Mr. Ghertler had admitted that in his plea of

15   guilty to that count, the only thing that we were talking

16   about here was whether or not he had actually identified

17   somebody named Larry.  The general counsel's name I believe

18   is actually David Manspizer but there was somebody apparently

19   named Lawrence who was talked to.  Whether he was called

20   Larry was the only dispute.

21             MS. HO:  Your Honor, the issue goes to one of the

22   factors that the court may consider in determining whether

23   the sophisticated means adjustment applies.  I addressed it

24   in my summary at page six.  The reference to Larry was to

25   Lawrence Stein who is Wyeth's general counsel.  In defrauding

1    Wyeth the defendant impersonated David Manspizer and referred
2    to a conversation he claimed to have had with Mr. Stein, to
3    whom he referred as Larry, which, in fact, is the nickname
4    that Mr. Stein goes by.  Those are facts that Agent Vecino
5    testified to based on his conversations with Wyeth employees.
6              THE COURT:  The objection to paragraph 21 is
7    overruled.  The objection as to paragraph 24 is overruled, as
8    are the objections in 25, 26, 27, 28, 29, 30, 31, 37, 39, 45,
9    48, and 50.
10             Now, in the defendant's summary with regard to
11   paragraphs 32, 33 and 34, Mr. Kenny, you make a point of
12   emphasizing the disparity in the sequence of events described
13   by the officer with regard to a telephone call that was
14   received by the FBI, is that right?
15             MR. KENNY:  Yes, Your Honor.  And that, of
16   course, stems from a telephone bill that we got after a
17   certain amount of prodding of the telephone companies, which
18   of course happened after the last hearing, and that's why I
19   submitted them as an addendum to our summary I guess we'd
20   call it because we didn't have it at the time, but we did get
21   it later and I've submitted it as a, it's clearly, I've
22   submitted the whole thing that we got, they blocked out the
23   things that we did not request, the dates that we did not
24   request, but it's clear that there was a telephone call made
25   to Miss Real's telephone at 10:55 on the 8th of January and,

1    according to Agent Houpt, no telephone calls were made to

2    her -- she's the girlfriend, Mr. Ghertler's girlfriend --

3    until after the Miranda warnings were signed, he calls it an

4    FD 395, that's the name of their form for the Miranda

5    warnings, and those are specifically signed at 11:10, 11:09

6    and 11:10 I think are the times, so that clearly somebody

7    made a telephone call to her from the FBI at 10:55, 15

8    minutes before the signing of the Miranda rights form.  And

9    Agent Houpt insisted that Mr. Ghertler did not make any

10   telephone calls to Miss Real until after the, after the

11   Miranda warning was signed.  He said that not only in his

12   testimony, but also in his 302 which I think was offered but

13   never actually ended up in evidence.

14          And I would also point out for the purposes of

15   this particular objection, Your Honor, something that I just

16   noticed recently, which is kind of an extraordinary

17   coincidence, and that is that Agent Houpt testified that he

18   was, he asked Mr. Ghertler about money between three quarters

19   of a million and a million dollars that supposedly Mr.

20   Ghertler was told he had taken, and that certainly was not

21   the amount that was listed in that memorandum that Agent

22   Vecino sent to Agent Houpt.  That was approximately $200,000.

23   And the coincidence I think is that the amount of money, the

24   million dollars, is almost precisely what the government is

25   claiming is the total loss in this case.  The three quarters

1    of a million dollars seems to be the actual loss for

2    everything.  So somehow before he started questioning Mr.

3    Ghertler, the agent knew the actual amount of loss, meaning

4    he must have also known the actual, the actual companies from

5    which these losses were taken.  And which, of course, would

6    then go to the question of whether he was accurate in what he

7    said because he said he didn't know those things.  And I

8    would suggest to the court that that's another reason not to

9    believe Agent Houpt and not to believe Agent Houpt about what

10   he said happened in this interrogation, but instead to

11   believe Mr. Ghertler, and to discount what the statements say

12   in regard to what Mr. Ghertler supposedly did.

13          THE COURT:  Miss Ho.

14          MS. HO:  Your Honor, with reference to the phone

15   records and the possible discrepancy and the exact time at

16   which the agents called Miss Real.  I would first note that

17   it is a minor discrepancy.  It might be a discrepancy.  At

18   this point I don't know.  And one of the reasons I'm not sure

19   is because I'm not sure what time zone these time stamps are

20   in the phone records because New Mexico, of course, is two

21   hours before us during certain times of the year.  I don't

22   think they're, they don't do daylight savings, and so, and

23   this particular subscriber has a 305 number on the eastern

24   time zone.  I don't know what to make of these records

25   because I don't know what the phone company, what its

1   practice is, that's one thing.  But the main thing is the

2   discrepancy is minor.

3            The phone calls were made, Agent Houpt testified

4   that the defendant voluntarily signed the Miranda forms, and

5   I submit that the discrepancy certainly does not undermine

6   the credibility of all of the agent's statements about what

7   the defendant said, for the same reasons that in a jury trial

8   the jurors are instructed that should they face a situation

9   where a witness gives inconsistent statements, they should

10  evaluate the inconsistent statements and weigh the witness's

11  credibility in light of them, in consideration of how

12  important that fact is.  And I think that that same principle

13  applies in this instance where the discrepancy is minor and

14  should not undermine the credibility of everything that Agent

15  Houpt said.

16           Now, with reference to the statement by Agent

17  Houpt in his report that one of the agents told the defendant

18  that the loss is between three quarters of a million and a

19  million dollars, since this is the first time I've heard

20  about it, if I could have a moment and speak to Agent Vecino.

21           Your Honor, to be honest, I don't have an

22  explanation, again, for that discrepancy because Agent Houpt

23  is not here to explain the possible discrepancy, but I would

24  again submit that that too is a minor discrepancy, that even

25  if unexplained does not render Agent Houpt lacking in

1    credibility to the point where his statements about what the

2    defendant said should be completely disregarded.

3              MR. KENNY:  May I respond just briefly to one

4    point, Your Honor?

5              I am assuming that these times are mountain time,

6    that is, New Mexico time.  If they're not and they are

7    eastern time, then that would put these phone calls two hours

8    ahead and they'd be almost one o'clock in the morning, which

9    would confirm more Mr. Ghertler's account than Agent Houpt's

10   account because Mr. Ghertler said that he was only allowed to

11   call after he finished giving the statement.  And I tend to

12   think that the phone calls or the phone times are mountain

13   time, but if not, it's even more likely that Mr. Ghertler's

14   version is correct and not Agent Vecino's.

15             I'd also note, Your Honor, for purposes of the

16   record, that the phone records indicate another telephone

17   call on the next morning, that is to say Wednesday, the 9th,

18   to, actually it's at 12:44 in the afternoon, whatever time

19   zone it is, to Las Cruces.  That's the FBI number.  And Miss

20   Real must have called there and talked to the FBI, but my

21   recollection is that Agent Houpt said the first time that he

22   talked to Miss Real was the following day or Friday which was

23   two days later.

24             THE COURT:  Okay.  Those are interesting points,

25   but the real issue before me is whether the statements

1    attributed to the defendant in paragraphs 32, 33 and 34

2    should remain in the PSR and considered by the court.  I find

3    that they should be.  There's no reason to doubt the account

4    of the agents with regard to those statements.

5              The next issue that needs to be addressed is the

6    objection as to paragraph 36.  Do you wish to speak to that,

7    Mr. Kenny?

8              MR. KENNY:  Your Honor, I don't think it's

9    particularly critical, and the fact of the matter is that Mr.

10   Ghertler was held past January 11.  He was not actually

11   released until March.  And, quite frankly, I am not at all

12   sure exactly what he was held on all the time.  As we talked

13   about earlier, Mr. Ghertler left the halfway house without

14   permission back on September 15 of 2006.  He was arrested on

15   the 24th, I believe, of November of 2006 and held initially

16   for the attempted fraud on Wyeth Pharmaceuticals because he

17   had been more or less caught in the act.  And at some point

18   he was, which I believe was at the beginning of December, he

19   was brought in front of the magistrate in this court for his

20   initial appearance on that case.  And then it was decided

21   that he was in fact in custody on the old case that where he

22   left from the halfway house.

23             At some point that changed and the court ordered

24   him released I think on January 11.  However, he did not get

25   released and that's really the point that I'm making.  And to

—12—

1     be truthful with you, I still am not entirely sure why.  It

2     may be that he needed to complete the sentence that he had

3     been in the halfway house for, but I'm not sure.  The only

4     reason I bring it up is just to make it clear that he was not

5     released.  He was still in custody after the 11th.  That's

6     the only reason I bring it up.  I don't think it makes a

7     great deal of difference as far as the proceedings today.

8     I'm just concerned that it may make some difference later on

9     when the PSR is used for purposes of classification and

10     things like that because there will be a gap in his time

11     between the 11th and March when he was actually released, the

12     11th of January and March when he was actually released, and

13     I don't want the people in the Bureau of Prisons to think

14     that he had escaped or something.  Again.  So that's the

15     reason I bring it up.

16          THE COURT:  Well, I think that your explanation

17     would cover that.  I don't think there's anything in the PSR

18     that would suggest that he escaped.

19          MR. KENNY:  No.  But the PSR suggests he was

20     released on the 11th and that was the only thing that

21     concerned me.  And I think the PSR, the revised PSR, I have

22     the one from October 31, paragraph 23, says that he was

23     released on the 26th, but then it says he was taken back into

24     custody, it doesn't say when.  I'm assuming, and perhaps we

25     could solve the whole problem by merely saying that on the

1   26th of January he was kept in custody or taken back into

2   custody by the Bureau of Prisons and that would, that would

3   complete the timeframe.

4              THE COURT:  Mr. Salce, would you make that

5   change?

6              PROBATION OFFICER:  Yes, Your Honor, I will.

7              THE COURT:  The objection is sustained.

8              The next objection that requires comment by

9   counsel would be with regard to, would be 43 with regard to

10  the amount of loss.  It's actually intended loss.  At some

11  point I thought that the defendant said that the government

12  agreed that the loss was between 400 and one million.  Is

13  that the government's position?

14             MS. HO:  Yes, it is, Your Honor.

15             THE COURT:  Okay.  Will that require a change in

16  the calculation under the guideline?

17             MS. HO:  Yes.

18             THE COURT:  In the addendum in paragraph 43 Mr.

19  Salce has increased the offense level by 16 for an intended

20  loss over a million dollars.  It should be 14.

21             MS. HO:  Yes.

22             THE COURT:  By your agreement.

23             MS. HO:  Yes.

24             THE COURT:  Mr. Salce, would you make that

25  change?

1          PROBATION OFFICER:  Yes, Your Honor.

2          THE COURT:  And in a minute I'll ask you to tell

3    me what effect that has.

4          The objection to 43 is sustained.

5          The next is 44 with regard to the number of

6    victims.  What is the government's position with regard to

7    44?

8          MS. HO:  That the addendum is correct as it is,

9    that there are, in fact, more than ten victims now that Your

10   Honor has made your findings.

11         MR. KENNY:  Well, Your Honor, based on your

12   findings, yes, there are more than ten victims.

13         THE COURT:  Objection is overruled as to 44.

14         And that takes us to paragraph 26 which was the

15   most interesting of the issues raised because this defendant

16   was not possessed with any position of trust.  There was no

17   trust reposed in Mr. Ghertler by any of the victims, but the

18   defendant in this case took on the identity of people who had

19   a relationship or relationships of trust with the victims,

20   and I think that is sufficient for application of the

21   guidelines.  The guidelines provide, quote, this enhancement

22   also applies in the case in which the defendant provides

23   sufficient indicia to the victim that the defendant

24   legitimately holds a position of private or public trust

25   when, in fact, the defendant does not.  For example, the

1  enhancement applies in the case of a defendant who, A,

2  perpetrates a financial fraud by leading an investor to

3  believe the defendant is a legitimate investment broker, or

4  B, perpetrates a fraud by representing falsely to the patient

5  or employer that the defendant is a licensed physician.  In

6  making the misrepresentation the defendant assumes the

7  position of trust relative to the victim that provides the

8  defendant with the same opportunity to commit a difficult to

9  detect crime that the defendant would have had if the

10  position were held legitimately.

11          And then the most revealing case, the case that

12  deals with this issue directly -- actually there are a couple

13  district cases.  I cite the case of United States versus

14  Sasseur which is 271 Federal Appendix 923, which dealt with

15  this issue stating the abuse of trust enhancement applies,

16  quote, if the defendant abused a position of public or

17  private trust or used a special skill in a manner that

18  significantly facilitated the commission or concealment of

19  the offense, end quote.  That's citing to the guidelines of

20  course.  The government must establish, one, that the

21  defendant held a place of private or public trust, and two,

22  abused that position in a way that significantly facilitated

23  the commission of a crime.  We have held that the enhancement

24  applies only when the victim conferred the trust.  And I

25  misspoke.  That's not the case most on point, but that is a

1    case that could be construed to weigh in favor of the

2    defendant.

3            The case of United States versus Alexander dealt

4    with the question of an impostor, that is 2000 Westlaw

5    1721142.  It's from the Southern District of New York.  In

6    footnote one the court says on November 1, 1998, an

7    application note to guideline section 3 B 13 was added to

8    clarify that the increase for abuse of trust applies to a

9    defendant who is an impostor as well as to a person who

10   legitimately holds and abuses a position of trust.

11           The objection to paragraph 47 is overruled.

12           Does that take care of all of the objections?

13           MS. HO:  I believe it does, Your Honor.  Looking

14   at my summary.

15           MR. KENNY:  May I have a moment, Your Honor?

16           THE COURT:  Yes, sir.

17           MR. KENNY:  I may have missed this, Your Honor,

18   but did you rule on paragraph 45 which was the sophisticated

19   means provision?  I'm sorry.  I'm not sure which one here my

20   note refers to.

21           THE COURT:  I believe I did, but let me make

22   sure.

23           The objection is overruled.

24           MR. KENNY:  All right.  Thank you.  May I have a

25   moment just to check with my notes, Your Honor?

```
 1              THE COURT:  Yes, sir.
 2              MR. KENNY:  I think that's all, Your Honor.
 3              THE COURT:  Mr. Salce.
 4              PROBATION OFFICER:  I believe the new total
 5    offense level, Your Honor, would be 29, criminal history
 6    category six, the imprisonment range would be 151 to 188
 7    months.  There are no other changes.
 8              THE COURT:  Thank you, sir.
 9              MR. KENNY:  Your Honor, I did have one other
10    thing, I'm sorry, and that is that, and this does not go to
11    the guidelines calculation at all, but in paragraph, on the
12    second unnumbered page of the PSR in the front two pages they
13    never number, Mr. Ghertler's address is listed as Winter
14    Garden, Florida.  That is the address of his ex-wife.  He's
15    not going to move back there obviously.  And he would,
16    however, plan to reside with Martin Smith at 4325 Pitt, P I T
17    T, Street, in Duluth, D U L U T H, Minnesota, 55804, and I
18    might ask that the PSR be changed to reflect that.
19              THE COURT:  Okay.
20              MR. KENNY:  And that would be the only other
21    change I think that we have at this point.
22              THE COURT:  Okay.  That's fine.
23              Would you make that change, please, Mr. Salce?
24              THE PROBATION OFFICER:  Yes, Your Honor.
25              THE COURT:  Would you accompany your client to
```

1       the podium, please?

2                       MR. KENNY:  Yes, sir.

3                       THE COURT:  Sir, would you raise your right hand

4       and be sworn?

5                       (DEFENDANT SWORN.)

6                       THE COURT:  Sir, what is your full name?

7                       THE DEFENDANT:  Jonathan David Ghertler.

8                       THE COURT:  And, Mr. Ghertler, have you had any

9       pills, drugs, medication or alcohol within the past 48 hours?

10                      THE DEFENDANT:  No, sir.

11                      THE COURT:  Have you been under the care of a

12      psychiatrist or psychologist for a mental or emotional

13      disorder in the past?

14                      THE DEFENDANT:  No, sir.

15                      THE COURT:  Do you have any reason to believe

16      that you suffer from such a disorder now?

17                      THE DEFENDANT:  No, sir.

18                      THE COURT:  Are you thinking clearly and

19      exercising your best judgment this morning?

20                      THE DEFENDANT:  Yes, sir.

21                      THE COURT:  Jonathan D. Ghertler, on July 28,

22      2008, you entered a plea of guilty to counts one through

23      eight of the indictment charging you with wire fraud in

24      violation of Title 18, United States Code, Sections 1343 and

25      2.  We've now reached that stage in the proceedings where I

1    must ask questions of you, your attorney as well as counsel

2    for the government.

3              First, have you had an opportunity to read and

4    discuss the presentence report?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  Now, you've raised objections in the

7    form of a filing with the court.  Have I addressed all of the

8    factual objections?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  Are there any objections to the

11   probation officer's application of the guidelines?

12             MR. KENNY:  None aside from the ones we've

13   already made, Your Honor.

14             MS. HO:  No, Your Honor.

15             THE COURT:  The court has ruled on all objections

16   made by the defendant.  I don't believe there were any

17   objections raised by the government.  Aside and apart from

18   the objections, the court adopts the position of the

19   probation office as stated in the addendum, and by that I

20   mean that the certain findings have been made by the court

21   that alter the presentence report.  To the extent that the

22   rulings have not affected the report, that report is adopted

23   as the findings of the court and the rulings are additional

24   findings made by the court.

25             The court determines that the advisory guidelines

1    are total offense level 29, criminal history category six,

2    151 to 188 months imprisonment, two to three years supervised

3    release, 766,500 restitution, 15,000 to $1,533,000 fine, $800

4    special assessment.

5              Are there any victims present in the courtroom,

6    Miss Ho?

7              MS. HO:  No, Your Honor.

8              THE COURT:  Do you know of any reason why the

9    court should not now proceed with imposition of sentence?

10             MR. KENNY:  No, sir.

11             MS. HO:  No, Your Honor.

12             THE COURT:  Do you wish to make a statement or

13   present any information in mitigation of sentence?

14             MR. KENNY:  Your Honor, I would.  I defer to some

15   extent to Mr. Ghertler.  I would simply point out that he did

16   plead guilty.  We have obviously challenged the relevant

17   conduct, but since the court has made a ruling on that, the

18   guidelines reflect that as well as his criminal history.  And

19   I would suggest to the court that a guidelines sentence, the

20   bottom of the guideline range, 151 months, would be

21   appropriate given the court's rulings and ask the court to

22   impose that sentence on Mr. Ghertler.

23             THE COURT:  Mr. Ghertler, this is your

24   opportunity to be heard.  You don't have to speak, but you

25   have a right to.  Do you wish to say anything?

```
1                   THE DEFENDANT:  Just a short statement, Your
2        Honor.
3                   THE COURT:  Okay.
4                   THE DEFENDANT:  Something's in me changed.  I
5        don't know what it is.  I don't know if it's the relationship
6        with my ex-wife, the family dynamic I was able to see with
7        the Reals, but it makes me want to get to wherever I'm going
8        to be doing my time and talk to someone about it, and see if
9        I can't work it out.  I've never been interested about that
10       before, didn't care, didn't feel, and I feel.  And I never
11       have.  It's foreign.  I don't know if I like it.  There have
12       been tears, you know.  It's been hard.  Every phone call I
13       make is difficult.  But I can move forward.
14                  I think I want to ask you to recommend a couple
15       places because they have good programs.  I don't have any
16       skills other than the ones that are rampant throughout this
17       PSR and I think I'd like to learn to do something different,
18       so if you'd take that into consideration as well.
19                  That's it.
20                  MR. KENNY:  Your Honor, he's talking about asking
21       that you recommend that he be sentenced either to Oxford,
22       Wisconsin or Wasica, W A S I C A, Minnesota.  They have a
23       culinary program there where he can learn to obviously be a
24       cook.  And we would ask that you do recommend that Bureau of
25       Prison places him there if they feel that's appropriate.
```

1          THE COURT:  Okay.  Anything else, sir?

2          THE DEFENDANT:  No.  Thank you, sir.

3          THE COURT:  The court has asked the defendant why

4    judgment should not now be pronounced, and after hearing

5    defendant's response, the court finds no cause to the

6    contrary.

7          Miss Ho, does the government wish to make a

8    statement?

9          MS. HO:  Yes, Your Honor.

10          THE COURT:  You may.

11          MS. HO:  Your Honor, the government requests a

12    high end sentence.  I rarely ask for the high end.  I rarely

13    find that a high end sentence is appropriate.  The facts of

14    this case on the surface would not be such a case where I

15    would think a high end sentence is appropriate because even

16    the low end is a significant sentence.  On the surface of the

17    case, the facts involved a white collar crime case that

18    involved a fraud of slightly less than a million dollars, and

19    for that even the low end of this defendant's guideline range

20    is a significant sentence given his criminal history.  But

21    the one benefit that came from spending a month getting ready

22    for trial and speaking with the witnesses, I have come to

23    understand that the true harm that this defendant poses to

24    the community is really not the financial harm to large

25    corporations which he, in his practice, tends to target, but

1    rather he leaves a wake of wrecked lives.  Maybe wrecked is

2    an overstatement, but certainly harmed lives because of what

3    he does.

4              Now, what I know from speaking with the witnesses

5    in this case who worked for the victimized companies, I mean

6    while it's certainly true that the companies could have

7    responded in a different fashion and not penalized those

8    people, but what I have come to understand is those companies

9    did not know the full context of this particular defendant's

10   conduct.  We do.  So we can, I think, better understand how

11   something like this could have happened at each of the

12   companies.  It is absolutely the defendant's fault that those

13   witnesses suffered professionally as they have, and in many

14   instances personally.  The Wyeth employees, one person was

15   demoted.  They lost bonuses.  They lost standing.  That's

16   also true at the SAIC employee whose situation was described

17   in the letter submitted by that company.  I spoke personally

18   with that witness.  And we just reiterate that he had a solid

19   record at that company that has been permanently damaged.

20   Permanently.  He's still at the company, but there is, in his

21   mind, no way of overcoming the situation that this defendant

22   put him in.

23              And then the effects are, go beyond the companies

24   that were even victimized.  I think that perhaps the victim

25   most harmed by the defendant's conduct was Jesse Nieves, the

1   courier, who was arrested, didn't have anything to do with

2   this, he's got an arrest record, he's 21 years old, never

3   been arrested as Your Honor asked him, he now has this record

4   to fix, to expunge.

5           THE COURT:  Which is questionable whether that

6   can even be done.

7           MS. HO:  Exactly.

8           THE COURT:  Was that a federal arrest?

9           MS. HO:  It was a state arrest.  And it obviously

10  was done in an absence of knowledge about the facts, but it

11  was done and he obviously was not involved in any criminal

12  conduct.  He's stuck with that for the rest of his life.

13  He's stuck with $8500 in debt resulting from the legal fees

14  coming out of that.

15          I could go on.  There were so many witnesses that

16  haven't even been mentioned.  For instance, I think briefly

17  the Lockheed representative who wrote a letter to the court

18  briefly mentioned that the couriers who delivered the money

19  for Lockheed were also personally traumatized.  I know again

20  from trial preparation that one of those witnesses was

21  pregnant at the time that she took the money to this

22  defendant, and she was very shaken by it when she found out

23  what she had been involved in unknown to her and had problems

24  in the pregnancy.  And I'm not suggesting that -- we don't

25  know.  She doesn't know.  But the problems occurred after the

1    incident.  She was extremely upset by it.

2        I mean this defendant just leaves in his wake

3    these people who are deeply affected and harmed by it.  To me

4    that's the real harm in this case.  These Fortune 500

5    companies should get their money back, I feel very strongly

6    that this defendant should be held accountable, to the extent

7    that he's able to, every penny that those companies are owed.

8    But in truth, we all recognize that those companies are going

9    to do perfectly fine without that money.  It's not going to

10   make a difference to their bottom line.  And that is why in

11   most cases, in most white collar cases I do not stand here

12   and ask for a high end sentence because I just don't think

13   that the situation warrants it.  I think this situation

14   warrants it.  This defendant is not going to stop.  He hasn't

15   even stopped while he's been in custody.  He's been trying to

16   do the same thing while he's been incarcerated.  One can only

17   imagine when he's got the freedom of being out what he could

18   accomplish if he could look up all of these companies on his

19   own computer.

20       I would suggest even, I don't know what kind of

21   recommendation the court is able or would be willing to make,

22   but I think while he's in prison his phone privileges should

23   be restricted because he clearly is able to from jail manage

24   to get pretty far in continuing his criminal conduct.

25       Now, granted, we don't have evidence that he was

1     successful, but Agent Vecino testified that he did, in fact,

2     try and call IBM.  The calls themselves that we heard reflect

3     the fact that he did make phone calls to Goldman Sachs.  And

4     he's doing this from jail.  I don't think he can stop.

5          He's a con artist, but the one true statement

6     that he's made is the statement in his written statement that

7     he cannot stop.  It's an impulse he cannot control.  And

8     that's the one statement that I believe coming out of his

9     mouth, that he cannot stop, and that the only way to make him

10    stop and to protect the public from his criminal impulses is

11    to keep him in jail for as long as the law allows.  And so

12    for that reason I request a high end sentence.

13          THE COURT:  The parties have made statements on

14    their behalf and the court has reviewed the presentence

15    report.  Pursuant to Title 18, United States Code, Sections

16    3551 and 3553, and the Sentencing Reform Act of 1984, it's

17    the judgment of the court that the defendant, Jonathan D.

18    Ghertler, is hereby committed to the custody of the Bureau of

19    Prisons to be imprisoned for a term of 185 months.  This term

20    consists of terms of 185 months on each of counts one through

21    eight, all such terms to run concurrent.

22          Upon release from imprisonment the defendant is

23    placed on supervised release for a term of three years.  This

24    term shall consist of three years on each of counts one

25    through eight, all such terms to run concurrent.

1         The mandatory drug testing requirements of the

2  Violent Crime Control Act are imposed. The court orders the

3  defendant to submit to random drug testing not to exceed 104

4  tests per year.

5         While on supervised release you shall comply with

6  the standard conditions adopted by the court in the Middle

7  District of Florida. In addition, you shall comply with the

8  following special conditions: You shall participate in a

9  substance abuse program, out-patient, in-patient or both, and

10  follow the probation officer's instructions regarding

11  implementation of this directive. Further, you shall

12  contribute to the cost of these services not to exceed an

13  amount determined reasonable by the probation office's

14  sliding scale for substance abuse treatment services.

15         During and on completion of the program you're

16  directed to submit to random drug testing. You shall

17  cooperate in the collection of DNA as required by the

18  probation officer. You shall be prohibited from incurring

19  new credit charges, opening additional lines of credit,

20  making acquisitions or obligating yourself for any major

21  purchases without approval of the probation officer. You

22  shall provide the probation officer access to any requested

23  financial information.

24         Based on your limited financial status, the fine

25  is waived. In lieu of paying a fine, you shall perform 150

1    hours community service as a condition of supervised release.

2         It is further ordered that you shall pay the

3    United States a special assessment totaling $800 which is due

4    immediately.

5         The mandatory restitution provisions of 18 U.S.C.

6    Section 3663A apply in this case.  It is ordered that you

7    shall make restitution in the amount of 766,500 to the

8    victims listed in the presentence report.  Restitution is

9    payable to the Clerk, U.S. District Court, for distribution

10   to the victims.

11        While in Bureau of Prisons custody you shall

12   either, one, pay at least 25 dollars quarterly if you have a

13   non-Unicor job, or, two, pay at least 50 percent of your

14   monthly earnings if you have a Unicor job.  Upon release from

15   custody you're ordered to begin making payments of $200 per

16   month, and this payment schedule shall continue until such

17   time as the court is notified by you, the victim or the

18   government that there's been a material change in your

19   ability to pay.

20        The guidelines range exceeds 24 months and the

21   reason for imposing the selected sentence is that after

22   considering the advisory sentencing guidelines and all other

23   factors identified in Title 18, United States Code, Sections

24   3553A 1 through 7, the court finds that the sentence imposed

25   is sufficient but not greater than necessary to comply with

1    the satisfactory purposes of sentencing.

2            You're hereby remanded to the custody of the

3    United States Marshal to await designation by the Bureau of

4    prisons.  The court notes that the defendant expresses an

5    interest in culinary arts and I'll leave it up to the Bureau

6    of Prisons to decide where you should be confined.

7            The record speaks for itself and will be reviewed

8    by the Bureau of Prisons.  The court notes that the defendant

9    has attempted to continue criminal activity using

10   communication devices while in confinement.

11           Mr. Ghertler, I have to say this is one of the

12   most interesting cases I've seen in a long career on the

13   bench, interesting because you yourself are an interesting

14   man.  I'm convinced that you could have been a lawyer, an

15   actor, a stockbroker, you could have pursued any number of

16   lawful courses of employment.  You're an intelligent man.

17   You're a gifted man in many respects.  And I hope that when

18   this is over or even before it's over that you'll put some of

19   your intelligence and some of your talent to good use.

20           It may be that you're right, that you can't help

21   it, that you're just compelled to do it.  It may be some

22   addiction to adrenalin that you, an adrenalin rush you get

23   when you're doing something that's outside the law.  But I'm

24   hopeful that you'll get some other sense of satisfaction by

25   putting your skills and your intellect to work within the

 1    law.  It's going to be difficult, but you know people or know

 2    of people who have turned around and made a contribution

 3    having had a background similar to yours.  I have to tell

 4    you, it is, it's mind boggling to hear of how you perpetrated

 5    these crimes.  You have to have tremendous insight, sales.

 6    You could be a wealthy man, you know, having a career in

 7    sales.  You know all this.  You know all this.  But the --

 8                    THE DEFENDANT:  Your Honor, can I just say --

 9                    THE COURT:  But the thing is if you get out and

10    you're still committed to this course of action, you know, it

11    only gets worse.  You're already a category six.  It doesn't

12    go any higher, but if you commit crimes in the future, you

13    will be treated more severely because of your criminal

14    record.

15                    The court having pronounced sentence, does

16    counsel for the defendant or the government have any

17    objections to the sentence or the manner in which the court

18    pronounced sentence, other than those previously stated for

19    the record?

20                    MR. KENNY:  Your Honor, I would ask also that the

21    court recommend the drug program, RDAP.

22                    THE COURT:  Which one?

23                    MR. KENNY:  RDAP.  It's the 500 hour special

24    program, you go to a special place and that you go through --

25                    THE COURT:  I will recommend that he be screened

1   for that program.

2           MR. KENNY:  Thank you, Your Honor.

3           MS. HO:  Your Honor, two questions with regard to

4   restitution.  First, I need to find the copies of the letters

5   that I provided Officer Salce with the addresses for the

6   victims.  May I submit those to your deputy clerk so that

7   they can be made a part of the judgment?

8           THE COURT:  Yes.  Is there any objection to that,

9   Mr. Kenny?

10          MR. KENNY:  I'm sorry, Your Honor.

11          THE COURT:  Miss Ho asked if she could submit the

12   addresses of the victims so that those addresses may be

13   included in the judgment.  They were not announced orally,

14   they were not part of the sentencing statement.

15          MR. KENNY:  That's fine, Your Honor.  I have no

16   objection to that.  And may I have a second, Your Honor?

17          (DISCUSSION OFF THE RECORD.)

18          MS. HO:  Your Honor, the second issue, would the

19   court consider including in the restitution order, order of

20   restitution also to Jesse Nieves who testified to the costs

21   that he incurred, and then attached to my sentencing summary

22   is a copy of the invoice that I obtained from Mr. Nieves'

23   lawyer reflecting that there was a charge of $7500 as a

24   retainer fee.  And then in addition to that, although they

25   were not able to provide documents to me, Mr. Nieves'

 1    attorney advised me that Mr. Nieves posted a non-refundable

 2    $1,000 for a $10,000 bond.

 3                    THE COURT:  So the total amount would be the --

 4                    MS. HO:  $8500.

 5                    THE COURT:  -- $7500 retainer and $1,000 dollar

 6    bond.

 7                    MS. HO:  Yes.  Thank you, Your Honor.

 8                    THE COURT:  You were talking to your client and I

 9    don't know.

10                    MR. KENNY:  I heard most of that, Your Honor.  I

11    did get a, what apparently was a bill to Mr. Nieves for $7500

12    from a lawyer that was submitted by the government.  I don't

13    know about the thousand dollars for the bond.  I'm not sure

14    that that's, I'm not sure that's an appropriate matter for

15    restitution.

16                    THE COURT:  Well, it should be.

17                    MR. KENNY:  I don't know, Your Honor.  I don't

18    know whether it is.  And secondly, certainly without some

19    indication, some written indication of the thousand dollars,

20    I would have to simply to insure that we're talking about the

21    right thing and ask that we be given some, there certainly

22    for a bond there would have to be paperwork and I'd like to

23    see the paperwork.

24                    In addition, Your Honor, I would like to put on

25    the record that Mr. Ghertler had approximately a thousand

```
 1    dollars in cash on him when he was arrested in New Mexico.

 2    This is for purposes of figuring out where the money for

 3    restitution would come from.  And he had approximately

 4    $20,000 in a bank account with I believe Regions Bank which I

 5    believe was collected by the government.  Obviously that

 6    would go towards restitution.  He's not asking for it back.

 7    I just want to make sure that that's clear.

 8              May I have a moment?

 9              (DISCUSSION OFF THE RECORD.)

10              MR. KENNY:  There were also some other accounts,

11    one in Amsouth, I believe, I don't know how much was in that.

12    As the court knows from the sentencing proceedings, Mr.

13    Ghertler opened accounts and then obviously there was still

14    money left in those accounts and those should go toward

15    restitution, obviously not back to Mr. Ghertler.

16              THE COURT:  They should.

17              MR. KENNY:  But he had roughly a thousand dollars

18    on his person when he was arrested in New Mexico and there

19    was approximately 20,000 dollars in a Regions Bank, whatever

20    it's called now, account, that I believe the government got.

21    So that should go toward restitution.

22              THE COURT:  Do you know anything about those

23    amounts, Miss Ho?

24              MS. HO:  Your Honor, we have not forfeited any

25    money from any bank accounts.  And what I think is true based
```

1    on the records that we had and were reviewing at the time of

2    trial is that there is little to no money left in the

3    accounts that we were looking at. I do not recall finding an

4    account where there was 20,000. We'd be happy to take the

5    money if it's there.

6              THE COURT: Well, if the money can be located, I

7    agree that it should be applied toward the restitution.

8              Now, Miss Ho has raised an issue in the way of an

9    objection to the sentencing regarding restitution for Jesse

10   Nieves. I remember him and I remember his role in all of

11   this and the question is whether his attorney's fee and bond

12   should be a part of the restitution. And I don't know the

13   answer to that and I do realize that you're being caught

14   flat-footed with it, with the objection, Mr. Kenny, because

15   it wasn't part of my preparation and apparently you weren't,

16   you didn't have notice of it.

17             I'm very concerned about a young person who

18   acquires a criminal record having done no wrong. I'm

19   currently dealing with a case from your office which is a

20   federal arrest where the defendant is found not guilty and

21   your office wants the record expunged and I'm finding that

22   it's not an easy matter in federal court, as it is in state

23   court, but even in state court, once it's expunged, as you

24   know, it's still a part of --

25             MR. KENNY: It's not completely expunged.

1          THE COURT:  No, never.  Never.

2          MR. KENNY:  They keep those forever.

3          THE COURT:  So I really want this hearing to be

4     over with, this sentencing to be over with, it's one of the

5     longest that I've had, but I feel that if there is a way

6     that, if that bond and those attorneys fees can legally be

7     made a part of the restitution, they should be.  But you're

8     right, I don't know whether they are and I'll delay it again

9     to give you an opportunity to find that out.

10         MR. KENNY:  May I ask for one other thing?

11         THE COURT:  If your client wants you to.  I mean

12    if you agree to it, that's fine, but if you object, then I'll

13    take time to look at it.

14         MR. KENNY:  Well, may I ask for one thing which

15    is part of this and that is, as I said earlier, I assume

16    there's some written paperwork showing how much Mr. Nieves

17    actually paid for the bond.  If it was a ten thousand dollar

18    bond it probably is a thousand dollars.  If you worked in

19    state court, you know that.  But for purposes of the record,

20    if nothing else, I'm sure that that can be produced.

21         MS. HO:  Well, I asked for it, Your Honor, and I

22    didn't get any response.  So really the only thing that I

23    have is just the email response from the law firm regarding

24    the information itself, and so I don't know if by their not

25    responding to my request they just don't have it or they

1  didn't provide it.  But I don't have written documentation

2  for that reason, I didn't get a reply.  I realize I didn't

3  pose this as an objection to the addendum or rather to the

4  original PSR because at that time I wasn't actually aware of

5  the cost that Mr. Nieves incurred.  But I did provide some,

6  quite some time ago a letter to Mr. Kenny with a copy of the

7  invoice saying I intend to ask for restitution.

8              MR. KENNY:  For the 7500 dollars, that's correct,

9  as I said earlier, Your Honor.

10             MS. HO:  And I would just note that 3663A defines

11  victim quite broadly.  It says victim means a person directly

12  and proximately harmed as a result of the commission of an

13  offense for which restitution may be ordered.  That's broad.

14  It doesn't have any sort of limitation regarding it has to

15  be, you know, the victim of the actual theft of the

16  defendant, it's anyone who's proximately harmed as well.

17  Actually, I think Mr. Nieves was directly harmed.  The arrest

18  itself justifies the restitution order.

19             MR. KENNY:  I don't have any of the cases in

20  front of me and I'm not sure quite frankly what they say, but

21  it seems to me at some point I remember there being cases

22  related to restitution for things like attorneys fees,

23  probably not quite in this context, but obviously in the

24  grand scheme of restitution 75 or even 8500 dollars

25  restitution in this case is not a lot.  But I would like at

1   least the opportunity to check and also of course to get some

2   sort of documentary evidence which would presumably be in Mr.

3   Nieves' court file if nothing else of the bond that was paid.

4   I can check and see what the cases say and report to the

5   court.  Assuming that the cases allow it, I don't see any

6   reason why we'd all have to come back again.  But I just

7   don't know in this case and in this situation I would like

8   the opportunity to at least do that.

9            THE COURT:  Well, I'm committed to get this case

10  over with, so I will see you all back here at one o'clock.

11  And, Miss Ho, you can see if you can get that bond, give me

12  whatever authority you have and you can do the same thing.

13  This hearing is recessed until one o'clock.

14            (RECESS.)

15            THE COURT:  We're back on the record in United

16  States of America versus Jonathan David Ghertler, case number

17  6:08 CR 90.  The remaining issue was whether the young man

18  who served as a courier for the defendant and was arrested as

19  a result was entitled to attorney's fees incurred in

20  defending the criminal action against him in state court as

21  well as the non-refundable portion of the bond that was

22  posted as a result of his arrest.

23            MS. HO:  Your Honor, the facts are very unique as

24  all the facts in this case, and so to find something directly

25  on point I think is not possible.  So what I found, in

1    addition to just relying on the plain language of 3663A and

2    that language again is language that defines victim for

3    purposes of the mandatory restitution act, defined it very

4    broadly to include victims who are directly and proximately

5    harmed by the defendant's conduct.

6         The most useful case that I was able to find

7    factually to illustrate that point is United States versus

8    Washington, a copy I believe has been placed on the bench.

9    It's found at 434 F.3d 1265.  It's a 2006 case that actually

10   came out of this court originating from a sentencing in front

11   of Judge Fawsett.  It involved a conviction for a bank

12   robbery in which the defendant after the bank robbery fled

13   and he crashed into the parking garage of a condominium

14   place, and then as he was trying to get into the parking

15   garage the police car trying to catch him didn't make the

16   clearance of the gate and so the gate smashed the police car,

17   and Judge Fawsett ordered restitution to both the condominium

18   association for the damage to the parking garage and to the

19   police department for the damage to the police car because of

20   the damage from the parking garage gate.

21        The facts are very different, but I think the

22   principle is the same, and that is the defendant in

23   Washington robbed a bank and then he fled and the flight and

24   the damage to the condominium and to the police car didn't

25   really necessarily have anything to do with the bank robbery.

1    They certainly weren't elements of the offense.  They were

2    something that happened after the commission of the offense.

3            And in our situation I think the harm to the

4    courier, Mr. Nieves, is even more direct, and that is he got

5    wrapped into one of the defendant's frauds unknowingly and

6    actually was a necessary part of the sequence of events and

7    was, his role was necessary for the success of the fraud

8    against the bank in that particular instance, and so his, the

9    harm that he suffered I think is more directly related to the

10   defendant's conduct than even the harm suffered by the

11   condominium association and the police department in the

12   Washington case.  The harm suffered was in the way of both

13   emotional, which obviously is not a subject for restitution,

14   and financial in the legal fees.

15           The act, 3663A does not limit the kinds of costs

16   that can be covered by restitution, and if it is the case

17   that the cost is something like a car getting smashed by a

18   parking garage gate, then that's a harm that was suffered and

19   that should be recompensed to the victim, and in this

20   particular case, the financial harm just happens to be in the

21   way of attorney fees.

22           THE COURT:  Were you able to provide Mr. Kenny

23   with a copy of some document that he paid the $1,000 bond?

24           MS. HO:  I contacted Mr. Nieves' law firm and

25   they confirmed that the reason they did not respond to me was

1   that they did not have the paperwork with that and that Mr.

2   Nieves did not either.  But they did direct me to a website

3   for Mr. Nieves' state case and the website information

4   contains the bond amount which was in the amount of $10,000.

5   And so if we can, if Your Honor would perhaps take judicial

6   notice of the procedures in state courts, it would make sense

7   that Mr. Nieves was required to post ten percent of that and

8   that typically is not refundable.

9           MR. KENNY:  Your Honor, and I think you have

10   copies of these cases.  I did find a couple of cases, they

11   are not in this circuit, but I think that they are fairly

12   representative of the state of the law at this point.

13           The case I would refer to first is United States

14   versus Saad, S A A D, which is at 544 F. Supp. 2d 589.  It is

15   an Eastern District of Michigan district court case.  In this

16   case the defendant was convicted by plea of trafficking in

17   counterfeit cigarette papers.  Apparently what had happened

18   was that one of the victims, the NTC was the original

19   producer of these papers and they had sued the defendant in

20   civil court, but the important point, so they asked for their

21   attorney's fees for the attorney's fees that they had

22   incurred suing the defendant in civil court.  However, on

23   page 591 they, the court, the district court recites the

24   cases which seem to relate to attorney's fees and it says in

25   some cases attorney's fees and or investigative costs were

1    recoverable and cites an Eighth Circuit case that says that

2    we hold that there is no blanket prohibition in the Victims

3    and Witnesses Protection Act against inclusion of attorney's

4    fees in the calculation of restitution amount for offenses

5    that don't result in damage to or loss or destruction of

6    property.  They then cite another case which brings in what

7    is a complication and that is that generally investigative

8    costs including attorney's fees incurred by private parties

9    as a direct and foreseeable result of the defendant's

10   wrongful conduct may be recoverable.

11          Then it goes on, the district court goes on to

12   say that where losses are consequential damages, they are not

13   recoverable, and it cites several circuits which have

14   specifically held that restitution under the Victims and

15   Witness Protection Act cannot include consequential damages

16   such as attorney's fees.

17          There is a somewhat more recent case, that case

18   by the way that I had just quoted is from February of 2008.

19   There is a Second Circuit Court of Appeals case from August

20   of 2008 which says that we hold that other expenses incurred

21   during the victim's participation in the investigation or

22   prosecution of the offense or attendance at proceedings

23   related to the offense may include attorney's fees and

24   accounting costs.  Then it says that the language gives, of

25   the act or the statute give the district courts broad

1    authority to determine which of the victim's expenses may be

2    appropriately included in a restitution order.  The statute

3    requires that the expenses be necessary and that they be

4    incurred during participation in the investigation or

5    prosecution of the offense or attendance at proceedings

6    related to the offense.  This is on pages 159 and 160 of the

7    case which is United States versus Amato, A M A T O at 540

8    F.3d 153.  It also requires as the statute, according to the

9    Second Circuit, that these expenses be incurred by a, open

10   quote, victim, close quote, within the meaning of the statute

11   and that they not require unduly complicated determinations

12   of fact.  Then it says the statute does not otherwise limit

13   the types of expenses that may be included.

14           And I will say to the court that that's about the

15   closest I could come anywhere in the United States.  There

16   does not seem to be, at least since the passage of the

17   Mandatory Victim Restitution Act in 1996, any case in which

18   the courts have ruled on criminal attorney's fees, that is,

19   when somebody else was charged with a crime.  So on the one

20   hand the statute at least according to the Second Circuit

21   seems to allow attorney's fees if they're incurred during

22   the, in essence the victim in this case it would be Mr.

23   Nieves helping out the investigation of the case, which

24   wasn't the case with Mr. Nieves, or his attendance at

25   proceedings relating to the offense, which of course isn't

1    accurate either.  Or with investigative or accounting costs,

2    and that doesn't appear to be the case.  And otherwise they

3    seem to be consequential, not direct damages, and thus not

4    recoverable.

5          Now, as I said earlier, there's no case that

6    specifically directs itself to the question of expenses which

7    are incurred by someone else charged by the crime, even if

8    he's later acquitted, so that's all I can find and that's all

9    I can tell you.

10          THE COURT:  Okay.

11          MR. KENNY:  Thank you.

12          THE COURT:  How about, Mr. Kenny, with regard to

13    the $1,000, are you satisfied based on court records that the

14    defendant was out $1,000 as a result of having to post a

15    $10,000 bond?

16          MR. KENNY:  I would assume that he would have

17    paid a thousand dollars.  Obviously I don't know that for

18    sure, but I would assume he paid a thousand dollars to get

19    out on a $10,000 bond.  I'll leave it up to you to make that

20    decision.

21          THE COURT:  Thank you.

22          I find that the victim, that Jesse Nieves was a

23    victim in this case.  Although he was not a person who was

24    defrauded as charged in the indictment, he was a person that

25    was used by the defendant in perpetrating a fraud that was

1    charged and for which the defendant has been convicted, and

2    as a result of the defendant's using him to perpetrate the

3    fraud, Mr. Nieves was arrested and was required to hire an

4    attorney and that he did pay the attorney $7,500 and that he

5    was required to post a $10,000 bond to retain his freedom

6    during the prosecution, and that as a result of that he lost

7    $1,000, an additional $1,000.  So I find that the victim,

8    Jesse Nieves, is entitled to restitution of 8,500 and will

9    require that the defendant make that restitution as a

10   condition of his supervised release.

11           In making this ruling I reemphasize what both

12   attorneys have already said and that is that this is an

13   unusual case and I can see many reasons why attorney's fees

14   would not ordinarily be the subject of restitution, but in

15   this case, as I've said, the victim was not suing to recover

16   and thereby incurring attorney's fees that the victim was not

17   seeing and incurring attorney's fees to establish any right.

18   He was defending himself as a result of being ensnared in

19   criminal conduct which was initiated and carried out by the

20   defendant in this case, and that those sums were incurred in

21   an attempt to extricate himself from this involvement.  And I

22   further find that he was unwittingly involved in this.  He

23   was acting in the course of his employment as he was

24   instructed to do and did not know that he was delivering

25   money which was the product of criminal fraudulent conduct of

1    the defendant.

2              Would you rejoin your counsel, please, Mr.

3    Ghertler?

4              To the extent permitted by your plea agreement,

5    Mr. Ghertler, you're now advised that it's your right to

6    appeal from this sentence within ten days from this date or

7    the date the judgment is recorded, whichever is later.

8    Failure to appeal within the ten day period shall be a waiver

9    of your right to appeal.  The government may file an appeal

10   from this sentence.  You're also advised that you're entitled

11   to assistance of counsel in taking an appeal, and if you're

12   unable to afford a lawyer, one will be appointed for you.

13              Do you understand everything that's happened,

14   here, sir?

15              THE WITNESS:  Yes, sir.

16              THE COURT:  Do you have any questions?

17              THE DEFENDANT:  No, sir.

18              THE COURT:  Court is in recess until nine o'clock

19   tomorrow morning.

20              (SENTENCING CONCLUDED.)

21

22              I certify that the foregoing is a correct
     transcript from the record of proceedings in the
     above-entitled matter.

23

                         *s/ Anthony Rolland*
24                        ANTHONY ROLLAND

25

# Exhibit D

217MgheP

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                 New York, N.Y.

            v.                            01 Cr. 879 (RLC)

JONATHAN DAVID GHERTLER,

                  Defendant.

------------------------------x

                                          January 7, 2002
                                          11:00 a.m.

Before:

                  HON. ROBERT L. CARTER,

                                          District Judge

                        APPEARANCES

JAMES B. COMEY
     United States Attorney for the
        Southern District of New York
BY:  LISA A. BARONI
        Assistant United States Attorney

ROBERT M. BAUM
        Attorney for Defendant

217MgheP

1              (Case called)

2              (In open court)

3              MS. BARONI:    Good morning, your Honor, Lisa Baroni for

4    the government.

5              MR. BAUM:    Robert M. Baum, Federal Defender's Office.

6    Good morning, your Honor.

7              THE COURT:    What are we going to do today?

8              MR. BAUM:    Judge, may we just have -- may I just have

9    two minutes to speak with my client?

10             THE COURT:    Yes, of course.

11             MR. BAUM:    Your Honor, my client would like to

12   withdraw his previously-entered plea of not guilty and to enter

13   a plea of guilty to each count in the indictment before the

14   court.

15             THE COURT:    You are prepared to do that today, right

16   now?

17             MR. BAUM:    My client would like to do that today.

18             THE COURT DEPUTY:    Do you have a copy of the

19   indictment?

20             MS. BARONI:    Yes.

21             THE COURT DEPUTY:    We left everything upstairs.

22             THE COURT:    I think you have to stand up, for one

23   thing.

24             MR. BAUM:    He has a problem standing.  He is in a

25   wheelchair.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

1          THE COURT:    I'm sorry.

2          MR. BAUM:    Judge, can we arrange something that we can

3    speak through this microphone.

4          THE COURT:    Mr. Ghertler, I understand that you wish

5    to withdraw your plea of not guilty and enter a plea of guilty

6    to all of -- I think it's six counts -- all five counts -- all

7    six counts of the indictment.

8          THE DEFENDANT:    Yes, sir.

9          THE COURT:    Have you gone over this indictment with

10   counsel and reached a conclusion that you want to plead guilty?

11         THE DEFENDANT:    Yes, sir.

12         THE COURT:    And you are pleading guilty because you

13   are in fact guilty, is that correct?

14         THE DEFENDANT:    Yes, sir.

15         THE COURT:    Now, I'm not putting you under oath, but

16   you realize that any question I put to you requires a factual

17   response, that you have to respond truthfully, or else you

18   expose yourself to possible prosecution of perjury.  Do you

19   understand that?

20         THE DEFENDANT:    Yes.

21         THE COURT:    How old are you?

22         THE DEFENDANT:    39.

23         THE COURT:    And what is the extent of your education,

24   formal education?

25         THE DEFENDANT:    14 years.  Two years of college, your

1    Honor.

2                   THE COURT:    I see that you are in a wheelchair.  Other

3    than that, how is your health?

4                   THE DEFENDANT:    I've got amyotrophic sclerosis, Lou

5    Gehrig disease.

6                   THE COURT:    Does that interfere with your ability to

7    be aware and to think and not have any problem?

8                   THE DEFENDANT:    No, sir.  I can think fine.

9                   THE COURT:    Have you ever been hospitalized or under

10   the influence of drugs?

11                  THE DEFENDANT:    Yes, sir.

12                  THE COURT:    Are you under the influence of any drug at

13   this time?

14                  THE DEFENDANT:    No, sir.

15                  THE COURT:    Your mind is clear?

16                  THE DEFENDANT:    Yes.

17                  THE COURT:    You can understand what I'm saying to you?

18                  THE DEFENDANT:    Yes, sir.

19                  THE COURT:    And can respond in kind?

20                  THE DEFENDANT:    Yes, sir.

21                  THE COURT:    You understand, Mr. Ghertler, that if you

22   continued with your plea of not guilty that the government

23   would be required to grant you a speedy trial?

24                  THE DEFENDANT:    Yes, sir, I understand.

25                  THE COURT:    And you also understand that at such a

217MgheP

1    trial you would be able to confront -- that is, cross-examine

2    any witnesses that the government produced against you.  Do you

3    understand?

4                THE DEFENDANT:    Yes.

5                THE COURT:    You under also understand that if you

6    could not afford counsel, the government could provide counsel

7    for you at such a trial?

8                THE DEFENDANT:    Yes, sir.

9                THE COURT:    Although you will not be required to, if

10   you wish to produce any evidence on your own behalf, you would

11   be allowed to do that?

12               THE DEFENDANT:    Yes, sir.

13               THE COURT:    And you understand that at such a trial

14   the government would be required to prove your guilt to the

15   satisfaction of the jury beyond a reasonable doubt before you

16   could be convicted.  Do you understand that?

17               THE DEFENDANT:    Yes, sir, I understand that.

18               THE COURT:    You also understand at such a trial that

19   you would not be required to incriminate yourself; that is, be

20   required to testify?

21               THE DEFENDANT:    Yes, sir, I understand that.

22               THE COURT:    Now, by pleading guilty, you have waived

23   all those rights that I just outlined?

24               THE DEFENDANT:    Yes, sir.

25               THE COURT:    You still want to plead guilty?

6

217MgheP

1        THE DEFENDANT:    Yes, sir.

2        THE COURT:    You also understand by pleading guilty you

3    expose yourself on the six counts -- on each of which you

4    expose yourself to five years imprisonment, a $250,000 fine,

5    three years supervised release, and a $100 special assessment.

6    Do you understand that?

7        THE DEFENDANT:    Yes, sir.

8        THE COURT:    So you still want to plead guilty?

9        THE DEFENDANT:    Yes, sir.

10       THE COURT:    Is there a plea agreement in this case?

11       MS. BARONI:    No, your Honor.  The defendant is

12   pleading to the full indictment pursuant to the Pimentel

13   letter.

14       THE COURT:    I am not authorized to accept your plea

15   unless I'm satisfied that you are in fact guilty what you are

16   pleading to.  Do you understand that?

17       THE DEFENDANT:    Yes, sir.

18       THE COURT:    With that in mind, I want you to tell me

19   what it was that you did on each of the times indicated on each

20   of the counts that will satisfy me that you pled guilty to what

21   you did?

22       THE DEFENDANT:    Your Honor, basically what I had done

23   was, I made a series of telephone calls.  Do you want me to go

24   over each number individually or just a blanket?

25       THE COURT:    I think you should do each one

SOUTHERN DISTRICT REPORTERS (212) 805-0300

217MgheP

1  individually.  Tell me what you did on February 12, June 6,

2  June 7, and June 8.

3          THE DEFENDANT:    On February 12, I called up -- I

4  believe it was the law firm of Heller, Ehrman and portrayed

5  myself to be a member of the firm and asked money to be wired

6  to my bank account.

7          THE COURT:    On June 6?

8          THE DEFENDANT:    I believe that was a telephone call to

9  a law firm here in the city, Skadden Arps, I believe requesting

10  that money be sent, posing as a member of the firm and asking

11  money to be sent.  The June 7 is just a followup call to the

12  first call.

13          THE COURT:    Money be sent to your account?

14          THE DEFENDANT:    To my personal bank account.  June 7,

15  I believe is a follow up call to Count 3.  On Count 2, your

16  Honor, I was just told that that was to Sullivan & Cromwell.

17  Count 3 is Skadden Arps, Count 4 is a followup to call to

18  Skadden Arps, Count 5 is another followup call to Skadden Arps.

19          MS. BARONI:    Your Honor, may I have a moment with

20  defense counsel?

21          THE COURT:    No.  When he is through --

22          MS. BARONI:    Okay.

23          THE DEFENDANT:    And Count 6 was a fax to Skadden Arps

24  just saying that -- an agreement to return the money, it was

25  part of the fraud, just that the money would be repaid within a

1    certain amount of time.

2              THE COURT:    In each of these calls, as I understand

3    it, you posed as a member of the firm that you were calling?

4              THE DEFENDANT:    Yes, sir.

5              THE COURT:    And except for the last call, you asked

6    them to send money to you?

7              THE DEFENDANT:    Yes, sir.

8              THE COURT:    And have the money deposited in your

9    personal bank account?

10             THE DEFENDANT:    Yes, sir.

11             THE COURT:    Obviously, you were not a member of the

12   firm, any of the firms, and you knew that you were not at the

13   time, correct?

14             THE DEFENDANT:    Yes, sir.

15             THE COURT:    And you knew that this was a scheme to get

16   money for your own account illegally, is that correct?

17             THE DEFENDANT:    Yes, sir.

18             THE COURT:    Now, are you having a problem?

19             MS. BARONI:    Your Honor, I believe in Count 2 and

20   Count 3 -- first, Count 2 on June 6, 2001 -- it was a telephone

21   communication from the defendant in Florida to the law firm of

22   Sullivan & Cromwell in New York City.  And with respect to

23   Count 3 on June 7, 2001, it was a telephone communication from

24   the defendant in Florida also to the law firm of Sullivan &

25   Cromwell.  I believe the defendant allocuted that it was

SOUTHERN DISTRICT REPORTERS (212) 805-0300

217MgheP

1    Skadden Arps that he called with respect to Count 3.

2              THE COURT:    Mr. Ghertler, would you like to amend it

3    according to what the government says?

4              THE DEFENDANT:    Yes, sir.  On Count 2 and 3, the phone

5    calls were made to Sullivan & Cromwell.  Counts 4 and 5 were to

6    Skadden Arps.

7              THE COURT:    And Count 1 was to Sullivan & Cromwell?

8              THE DEFENDANT:    Count 1 it was Heller Ehrman, I

9    believe.  I think that may be Willkie Farr, your Honor.

10             THE COURT:    Is that correct?

11             MS. BARONI:    That's right, your Honor.

12             THE COURT:    Willkie Farr was Count 1.  And the last

13   count is a fax to Skadden Arps, is that correct?

14             THE DEFENDANT:    Correct.

15             THE COURT:    Are you satisfied?

16             MS. BARONI:    Your Honor, if the defendant could be

17   allocuted on whether he knowingly and willfully participated in

18   this scheme to defraud in Counts 1 through 6 of the indictment.

19             THE COURT:    Did you hear the government?

20             MR. BAUM:    He didn't hear.

21             MS. BARONI:    Your Honor, if the defendant could be

22   allocuted on whether he knowingly and willfully participated in

23   the scheme and artifice to defraud with the knowledge of its

24   fraudulent nature and the specific intent to defraud.

25             THE DEFENDANT:    Yes, I understand that I committed an

217MgheP

1    act of fraud against all of the law firms.

2              THE COURT:    Are you satisfied now?

3              MS. BARONI:    Yes, your Honor.

4              THE COURT:    I will accept the plea, and I think,

5    because of what probation wants or needs in time, we can't have

6    the sentencing until April.

7              MR. BAUM:    Judge, what we would like to try and do is

8    do an expedited sentencing, if possible.  I don't know if your

9    Honor is available.

10             THE COURT:    The problem is, I can't do a sentence

11   until the probation -- the probation wants 90 days.  You can't

12   have a sentence until there is a presentence report.  90 days

13   takes us to April.

14             MS. BARONI:    Your Honor, I don't believe this is a

15   case that necessarily requires an expedited sentencing.  The

16   defendant is obviously facing a substantial period of

17   incarceration.

18             MR. BAUM:    Judge, there are two reasons why an

19   expedited sentencing would be appropriate here.  One is because

20   of his medical condition, which is worsening, and if he were

21   sentenced sooner, he would probably, even if incarcerated, be

22   amenable to better medical facilities than he is currently

23   getting at MDC in Brooklyn.  They are virtually not treating

24   him.

25             The second reason why an expedited sentencing would be

1    appropriate is that he had been sentenced previously in federal

2    court, I believe, in the Northern District of Alabama.

3    Therefore, there already exists a presentence report which

4    probation can use to actually do this in less than 90 days.

5    What we are asking for, Judge, respectfully, is the earliest

6    possible date that's convenient to the Court.

7              THE COURT:    Well, all right.  But I think what I'm

8    going to ask the government to do -- I'll certainly do that.

9    But I think that I want you to explore the possibility of his

10    securing medical attention.  If I need to intervene, I will as

11    well.  There isn't any reason why he shouldn't get any medical

12    attention.

13             MS. BARONI:    Your Honor, I understand there are

14    hospital facilities that the defendant can be sent to.

15             THE COURT:    You make the inquiry and get in touch with

16    my clerk, and I'll follow it up if I need be, and we will talk

17    to probation.  We will talk to probation about whether they can

18    accept -- can do something less than 90 days.

19             MR. BAUM:    Judge, Mr. Ghertler would like to make one

20    statement with reference to your comment.

21             THE DEFENDANT:    Your Honor, the facility I'm at, MDC,

22    they have known that I've had this illness since I got there.

23    They have told me they would send me to these medical

24    facilities and everything like this, and then everything

25    disappeared.  I haven't seen a doctor in three months.

217MgheP

1          THE COURT:    I heard.  What I am going to do is, in the

2     meantime, I'm going to try to get the sentence expedited so you

3     can get treatment and I'm also going to try, in the meantime,

4     to get you some medical attention.  That's the best I can do.

5          THE DEFENDANT:    Thank you, sir.

6          THE COURT:    Is there anything else?

7          MR. BAUM:    Nothing further, Judge.

8          THE COURT:    Would you get in touch with my clerk,

9     right, as soon as possible?

10          MS. BARONI:    Yes, your Honor.

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25